**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| ROBERT GLEN MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.: |
| | ) | |
| | ) | |
| LODGE OF FOUR SEASONS LLC | ) | |
| a Limited Liability Company | ) | INJUNCTIVE RELIEF SOUGHT |
| d/b/a THE LODGE OF FOUR SEASONS | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

## COMPLAINT

Plaintiff, ROBERT GLEN MYERS (hereinafter "MYERS"), by and through the undersigned counsel, hereby files this Complaint and sues LODGE OF FOUR SEASONS LLC, Limited Liability Company, d/b/a THE LODGE OF FOUR SEASONS ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.4seasonsresort.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MYERS, full and equal access to Defendant's products and services.

2.     MYERS files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.     Accordingly, MYERS seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.     This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.     Venue is proper in this Court, St. Joseph Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Western District of Missouri in that a substantial part of the acts and omissions giving rise to MYERS's claims occurred in Caldwell County, Missouri.

6.     Defendant attempts to and indeed does, participate in Caldwell County's economic life by offering and providing products and services over the internet to Caldwell County's residents, including MYERS. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Caldwell County residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Missouri every time a Missouri resident visits Defendant's Website.

7.     Further, Defendant operates a Principal Place of Business with a physical address of 315 Four Seasons Dr., Lake Ozark, Missouri 65049 (hereinafter "Defendant's Principal Place of Business").

8.     MYERS was injured when he attempted to access the Digital Platform and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.     MYERS is a natural person over the age of 18 and is blind.

10.     MYERS is *sui juris* and is a resident of the State of Missouri residing in Hamilton, Missouri, located in Caldwell County.

11.     MYERS is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MYERS is legally blind from age-related macular degeneration[1], and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MYERS uses screen access software to access digital content, like text messages, emails, and websites.

12.     MYERS cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

---

[1] The term "blind" or "blind person" as used throughout this complaint refers to persons with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200. Some blind people who meet this definition have limited vision, whereas others have no vision.

reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.    MYERS' blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.    MYERS frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MYERS uses commercially available screen reader software to interface with the various websites.

15.    Defendant is Limited Liability Company with a principal place of business of 315 Four Seasons Dr., Lake Ozark, MO 65049   (hereinafter "Defendant's Principal Place of Business").

16.    Defendant operates at Defendant's Principal Place of Business. Defendant's Website offers a variety of amenities and experiences, including 36 holes of championship golf, a nationally recognized spa, and four casual dining restaurants. Defendant also offers special deals and packages for room reservations and spa packages. Additionally, Defendant provides options

4

like golf packages, spa visits, and gift card purchases. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17.    Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18.    Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business are also referenced as "place of public accommodation".

19.    Defendant's Website serves as a crucial extension of Defendant's Principal Place of Business. Defendant's Website provides prospective and current guests with comprehensive access to Defendant's offerings, including making room reservations, exploring accommodation options, viewing dining and recreational services like golf packages and spa treatments available at Defendant's Principal Place of Business, and making reservations for dining and spa services. By offering detailed information on business hours, contact details, and special promotions, Defendant's Website functions as a virtual representation of Defendant's Principal Place of Business, allowing seamless interaction and engagement with Defendant's services. Defendant's Website facilitates the accessibility and convenience for guests to plan their stay and experience at Defendant's Principal Place of Business, thereby creating a direct legal and operational nexus between Defendant's Website and Defendant's Principal Place of Business.

20.     At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.     MYERS is and has been a customer who is interested in patronizing and intends to patronize in the near future once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.     Defendant's Website functions as an essential extension of Defendant's Principal Place of Business. Defendant's Website provides comprehensive information about Defendant's key services, including accommodations, dining, golf packages, and spa treatments, which are all available at Defendant's Principal Place of Business. Defendant's Website allows users to check room availability, make reservations for rooms, dining and spa services, and explore special offers. Defendant's Website also lists upcoming events and live music schedules, reflecting the active business hours and entertainment options offered at Defendant's Principal Place of Business. Contact details, including a reservation line and main telephone number, further bridge Defendant's Website with Defendant's Principal Place of Business, ensuring seamless communication and customer service for prospective and returning guests. Thus, Defendant's

Website not only advertises but also operationalizes Defendant's services, reinforcing Defendants' Website's role as a virtual extension of Defendant's Principal Place of Business.

23.     Defendant's Website is additionally used to search for brick and mortar store locations, check Defendant's store hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or Defendant's Principal Place of Business.

24.     The opportunity to shop and pre-shop Defendant's offerings available for purchase in Defendant's Principal Place of Business and sign up for an electronic mailer to receive offers, benefits, exclusive invitations, and discounts for use in Defendant's Principal Place of Business from his home are important accommodations for MYERS because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MYERS' in-store experience, such that they are tied to and provide a benefit to MYERS. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25.     Like many consumers, MYERS accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MYERS may view several dozen websites to compare features, discounts, promotions, and prices.

26.     MYERS utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27.     On or about the following dates, MYERS attempted to utilize Defendant's Website:

a.       March 13, 2025;

b.       March 26, 2025;

c.       July 08, 2025; and

d.       September 15, 2025.

(hereinafter "MYERS' Website Visits"). During MYERS' Website Visits, MYERS experienced substantial access barriers and, thus, was denied fair and equal access to same. MYERS was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.      While notice to Defendant is not required, MYERS sent a pre-suit communication on March 26, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.      Prior to initiating suit, but following the sending of the pre-suit communications, MYERS has continued to attempt to utilize Defendant's Website during MYERS' Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.      However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.      MYERS adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"),
42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from
enactment of the statute to implement its requirements.  The effective date of Title III of the ADA
was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and
gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.     Congress found, among other things, that:

a.      some 43,000,000 Americans have one or more physical or mental disabilities, and
this number shall increase as the population continues to grow older;

b.      historically, society has tended to isolate and segregate individuals with disabilities
and, despite some improvements, such forms of discrimination against disabled
individuals continue to be a pervasive social problem, requiring serious attention;

c.      discrimination against disabled individuals persists in such critical areas as
employment, housing, public accommodations, transportation, communication,
recreation, institutionalization, health services, voting and access to public services
and public facilities;

d.      individuals with disabilities continually suffer forms of discrimination, including
outright intentional exclusion, the discriminatory effects of architectural,
transportation, and communication barriers, failure to make modifications to
existing facilities and practices. Exclusionary qualification standards and criteria,
segregation, and regulation to lesser services, programs, benefits, or other
opportunities; and,

e.      the continuing existence of unfair and unnecessary discrimination and prejudice
denies people with disabilities the opportunity to compete on an equal basis and to

pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

  a.  provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities;

  b.  provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

  c.  invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[2]

37.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[3] and private individuals[4] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[5]

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[6] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[7]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[8]

---

[2] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[3] 42 U.S.C. § 12188(b).

[4] 42 U.S.C. § 12188(a).

[5] Johnson, *supra* note 8.

[6] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[7] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[8] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

40. Consistent with these policies, MYERS files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing the opportunity to explore and pre-arrange Defendant's services available for booking through Defendant's Website and sign up for electronic communications to receive offers, benefits, exclusive invitations, and discounts for use at the resort are important accommodations. This is particularly beneficial for individuals like MYERS, for whom traveling outside of their home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant's Website does not provide its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2)

specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.    Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MYERS, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.    MYERS encountered barriers on each of MYERS' Website Visits. On or about March 13, 2025, MYERS initially attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of the Defendant's Website do not interface with MYERS's screen reader software. Specifically, features of Defendant's Website are inaccessible to MYERS' screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a.    **Unnecessary alt text for decorative image**

i. **Issue:** Decorative images on the page have been given alt text that is not needed, such as "Flourish." This practice results in unnecessary clutter for screen reader users, obstructing their ability to quickly locate and process important information.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** Users with visual disabilities, particularly those who are blind, experience increased difficulty navigating content due to superfluous descriptions of decorative images. This hinders efficient interaction with the page, as they are subjected to irrelevant information.

b. **Inaccurate alternate text is specified for image**

i. **Issue:** Images on the page have been assigned inaccurate alternate text, which significantly impedes screen reader users. For example, using "https://4seasonsresort.com" as alternate text for an informative image does not convey any meaningful information, depriving visually impaired users of necessary context and understanding.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Informative

iii. **Impact:** This lack of accurate alternate text leaves screen reader users without the same comprehension as sighted users, impairing their ability to navigate and understand page content effectively. It is crucial to provide descriptive alternate text to ensure equal access to information.

c. **Incorrect Use of `aria-current` Causing Navigation Confusion for Screen Reader Users**

i. **Issue:** The incorrect application of the `aria-current` attribute on the homepage logo leads to confusion for screen reader users by falsely indicating its status as the current page. This misleads users about the navigation structure, complicating their experience of moving through the site.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** Screen reader users may encounter confusion and frustration due to the misleading navigation cues, making it difficult to locate essential content. Accurate use of `aria-current` is vital to prevent misunderstandings about a user's position on the website.

d. **Menu items inaccessible for screen reader users**

i. **Issue:** The header menu lacks appropriate roles for "menu" and "menu items," and does not communicate the expand/collapse state, leading to user confusion. Screen reader users are left to guess about the availability of options, severely hindering their ability to navigate the menu.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Menubar Navigation

iii. **Impact:** Without correct role assignments and state information, screen reader users face significant challenges in menu navigation, resulting in frustration and difficulty accessing content. Properly defining roles and states for interactive elements is essential for effective interaction.

e. **Non-descriptive and identical links announced for screen reader users**

i. **Issue:** Links with generic text like "Learn more" fail to specify the destination or content, creating confusion for screen reader users. Identical link text pointing to different pages exacerbates this issue, forcing users to guess the link's purpose.

ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** Visually impaired users encounter barriers in navigation due to non-descriptive and identical link text, making it challenging to predict the link's outcome. Providing unique and meaningful link descriptions is crucial to facilitate understanding and prevent confusion.

f. **Use of multiple <h1>'s on the page**

i. **Issue:** The presence of multiple `<h1>` headings on the page causes confusion for users utilizing screen readers. The `<h1>` heading is intended to represent the primary topic of the page; however, having more than one creates ambiguity regarding the page's most critical content. This ambiguity complicates users' comprehension of the page layout and hinders their ability to locate pertinent information. Users dependent on screen readers may struggle with navigation and accessing necessary content.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** Users who are visually impaired, particularly those who are blind, may experience significant confusion due to multiple `<h1>` headings, making it difficult to discern the main subject of the page.

This confusion can lead to challenges in understanding the page's structure and impede their ability to navigate effectively to find essential information. By ensuring only one `<h1>` heading is utilized, screen reader users can better comprehend the page's organization, thereby improving their overall experience.

g.  **Missing visual label for form fields**

   i.  **Issue:** The label "Nights" is inadequately linked to its corresponding dropdown menu, causing clarity issues for users dependent on screen readers. The absence of this association obscures the dropdown's purpose for assistive technology users, resulting in confusion and a lack of understanding of the element's function.

   ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Labels

   iii.  **Impact:** Users who rely on screen readers, particularly those who are blind, may find it difficult to discern the purpose of the dropdown due to the missing label linkage. This obstacle can lead to frustration and impede their ability to engage with the form accurately. Properly associating the label with the dropdown, either through the `for` attribute in the `<label>` element matched with the dropdown's `id` or using the `aria-labelledby` attribute, will facilitate a seamless interaction and understanding for users relying on assistive technology.

h.  **Non-descriptive image link**

   i.  **Issue:** The link labeled "RESERVATIONS" in the header lacks a descriptive text indicating that it opens in a new window, creating an obstacle for users of screen readers. While sighted users gain context from visual cues, those utilizing screen readers are deprived of critical information, rendering navigation ambiguous and inaccessible.

   ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

   iii.  **Impact:** Visually impaired users, especially those who are blind, may encounter significant difficulties due to the lack of descriptive link text. This deficiency leaves them unable to comprehend the link's purpose when read out of context, thus complicating navigation. Providing unique and informative link text ensures that screen reader users can effectively understand and interact with the webpage's content without visual context.

i.  **Heading mark-up used unnecessarily**

i. **Issue:** Text elements such as "15% Off," "Visit Spa Shiki," and "Purchase a Gift Card" are improperly formatted as headings, creating substantial barriers for users of screen readers who depend on headings for page navigation. These elements, not being actual section headings, can mislead users expecting significant content or organization, thereby disrupting navigation and complicating access to relevant information.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** Users with visual impairments, particularly those who are blind, may experience confusion and navigation challenges because misleading markup suggests a structure that does not exist. This misuse of headings can lead to unnecessary frustration and difficulty in locating pertinent information. Correctly implementing heading structure enhances the comprehensibility and navigability of content for screen reader users.

**j.     Landmark is not defined**

i. **Issue:** The absence of a defined header landmark on the page poses a challenge for screen reader users. Without a clear landmark, users relying on assistive technology face difficulties in grasping the page layout and locating critical content, thereby complicating their ability to navigate the site effectively.

ii. **WCAG 2.1 AA Violations:** 2.4.1- A - Bypass Blocks

iii. **Impact:** Users who are visually impaired, especially those who are blind, may struggle to navigate and understand the structure of the webpage due to the lack of a defined header landmark. This absence hinders their ability to efficiently locate and access essential information. By defining the header landmark, screen reader users are afforded a more accessible and navigable experience, enhancing their interaction with the site.

**k.     Duplicate Footer Region Creates Navigation Confusion for Screen Reader Users**

i. **Issue:** The footer region is defined twice on the page, causing confusion for screen reader users. When multiple footers are present, users relying on assistive technology may struggle to discern which footer contains the critical information needed. This complicates navigation and can

lead to frustration, as users may encounter unnecessary content while searching for desired information.

ii. **WCAG 2.1 AA Violations:** 2.4.1- A - Bypass Blocks

iii. **Impact:** Visually impaired users, particularly those who are blind and use screen readers, may experience significant confusion and difficulty navigating the website due to the duplication of footer regions. This can impede their ability to efficiently locate important content, undermining their overall user experience and accessibility.

l. **Missing keyboard support for date buttons**

i. **Issue:** The date buttons lack keyboard navigation support, hindering screen reader users who rely on keyboard inputs for date selection. Without the ability to navigate and select dates via keyboard, users are unable to effectively interact with the date picker, thus preventing them from booking hotel accommodations for their desired dates.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Individuals with visual impairments, especially those who are blind, face significant barriers when date buttons do not support keyboard navigation. This limitation prevents them from selecting dates, thereby obstructing their ability to perform tasks such as booking hotel stays, ultimately compromising their accessibility and user experience.

51. Defendant's Website was subsequently initially audited by Plaintiff's expert, Till Paris, on March 23, 2025, and who confirmed the access barriers that MYERS had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert during this initial audit are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers rendered Defendant's Website inaccessible to users who are blind and visually disabled, including MYERS.

52.     Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

53.     Here, however, MYERS, through counsel, did send a pre-suit communication informing of the barriers to access on March 26, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

54.     On or about July 08, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    a.    **Unnecessary alt text for decorative image**

        i.  **Issue:** Decorative images on the page have been assigned unnecessary descriptions, such as "Flourish." This practice creates obstacles for users of screen readers, as these descriptions introduce clutter and hinder the discovery of crucial information.

        ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

        iii.  **Impact:** Visually impaired users face challenges when decorative images have unnecessary descriptions. This additional information clutters the auditory experience, making it difficult to locate vital content. Consequently, users may miss important information due to the unnecessary descriptions provided for decorative images.

    b.    **Incomplete Alternative Text for Logo Image**

        i.  **Issue:** The alternative text for the logo image is incomplete, preventing screen reader users from fully comprehending the image. The alt text fails to convey all crucial details, resulting in only partial information

being available to users who rely on screen readers, thereby creating an accessibility barrier.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Informative

iii. **Impact:** Screen reader users encounter difficulties in understanding logo images due to incomplete alternative text. This partial information impairs their ability to perceive the complete meaning and context of the logo, highlighting the need for comprehensive alt text that reflects the full contents of the image, enabling visually impaired users to have equal access to information as sighted users.

c. **Incorrect Use of `aria-current` Causing Navigation Confusion for Screen Reader Users**

i. **Issue:** The logo image on the home page is improperly assigned the aria-current attribute, which is designed to denote the currently active item within a navigational set, like menu items or tabs, rather than standalone elements like a logo. This misuse leads to confusion for screen reader users, potentially misleading them to believe the logo signifies the current page within a navigation group.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** Visually impaired users may experience navigational confusion when the aria-current attribute is misapplied to a logo image. This incorrect application can lead to misunderstandings about the navigation context, potentially causing users to misinterpret the logo as indicating the current page, thus complicating navigation and access to content.

d. **Menu items inaccessible for screen reader users**

i. **Issue:** The menu and sub-menu items lack proper definition through role="menu" and role="menuitem." As a result, the menu expands automatically when screen reader or keyboard focus lands on the parent menu item, without any user action. This behavior restricts users from intentionally managing menu interactions, leading to a confusing and inaccessible navigation experience.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menubar Navigation

iii. **Impact:** Screen reader users face barriers when interacting with menus that automatically expand without intentional user actions. The lack of

control over menu interactions causes confusion, making navigation challenging and potentially excluding users from accessing necessary menu content.

**e.**     **Non-descriptive and identical links announced for screen reader users**

    i. **Issue:** Links on the page include non-specific text like "Learn more," "Click here," or "Read more," inadequately describing their purpose or destination. This lack of specificity poses challenges for screen reader users or those navigating by links, as the link's destination remains unclear, especially when read out of context.

    ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

    iii. **Impact:** Users who depend on screen readers encounter difficulties when links are non-descriptive and identical, leading to ambiguity in understanding the link's destination. This lack of clarity impedes seamless navigation and access to content, underscoring the necessity for link text to be specific and informative, even when isolated from surrounding context.

**f.**     **Two Footer Sections Defined on the Page**

    i. **Issue:** The webpage contains two separate <footer> landmarks, creating confusion for users of screen readers and assistive technologies who depend on landmarks for navigation. The presence of multiple identical landmarks without clear labeling or distinction renders it difficult to comprehend the page structure or discern which footer includes specific content.

    ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Landmark Regions

    iii. **Impact:** The existence of two distinct <footer> landmarks on the page results in confusion for users of screen readers and assistive technologies who rely on landmarks for navigation. The lack of clear labels or distinctions among identical landmarks makes it challenging to understand the page's structure or identify the content each footer holds. Expected Behavior: Each landmark region, such as <footer>, should be used only once per page, or if multiple landmarks of the same type are necessary, each should be uniquely labeled using aria-label or aria-labelledby to distinguish their purposes, such as labeling one footer 'Global Footer' and the other 'Subscription Footer.'

**g.**     **Improper Use of <header> Tag Within Footer Section**

i. **Issue:** Headings within the footer section are incorrectly enclosed within a <header> element. The <header> tag is intended to denote introductory content for a page or a section, and its use within the <footer> creates a conflicting and confusing structure, which hinders screen reader users from accurately interpreting the content's meaning and organization.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A, 2.4.1 - A - Landmark Regions

iii. **Impact:** The misplacement of headings within a <header> element in the footer section leads to a contradictory and confusing structure, impairing screen reader users' ability to correctly interpret the content's meaning and organization. Expected Behavior: Headings in the footer section should not be enclosed within a <header> tag. Instead, they should be directly wrapped in appropriate heading tags such as <h2>, <h3>, etc., based on the heading level hierarchy, without introducing a semantic landmark that misrepresents the section's role.

h. **Non-Section Titles Like "Stay & Play" and "Visit Spa Shiki" Misused as Headings**

i. **Issue:** Text like "Stay & Play," "Visit Spa Shiki," and "Purchase a Gift Card" is erroneously marked with heading tags (e.g., <h2>, <h3>) despite not introducing or labeling sections of content. This misapplication makes it difficult for screen reader users to perceive the true page structure, as headings suggest a meaningful content hierarchy that is absent in this context.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** The mislabeling of text such as "Stay & Play," "Visit Spa Shiki," and "Purchase a Gift Card" with heading tags leads to confusion for screen reader users, as it implies a meaningful content hierarchy that does not exist. This misrepresentation hinders their understanding of the page's structure. Expected Behavior: Only genuine section titles or content group labels should be marked as headings. Text should be appropriately marked up using elements like <p>, <strong>, or visually styled <div>s unless they introduce actual subsections of content.

i. **Landmark is not defined**

i. **Issue:** The absence of a <header> landmark region on the page is detrimental to screen reader users who depend on it to understand and

navigate the page structure. Without this landmark, users relying on assistive technologies are unable to identify the beginning of the page or locate global elements such as site branding, logo, or primary navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.1- A - Bypass Blocks

iii. **Impact:** The lack of a <header> landmark region impedes screen reader users' ability to comprehend and navigate the page structure, as it prevents them from identifying the page's beginning or locating global elements like the site branding, logo, or primary navigation. Expected Behavior: The page should incorporate a semantic <header> element (or an element with role="banner") at the top, containing global site content like the logo, site title, and main navigation. Only one <header> landmark should be used per page or per section if the page contains multiple regions.

**j.** **Screen Reader Focus Does Not Move to Newly Added Form Fields**

i. **Issue:** Activating the "Add Room" button dynamically inserts new form fields into the page, yet the screen reader focus remains on the button rather than shifting to the newly added content. This oversight makes it difficult for screen reader users to detect the addition of new fields, causing confusion and hindering their ability to interact with the form without additional navigation effort.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** The failure to shift the screen reader focus to newly added form fields after activating the "Add Room" button leads to confusion and prevents screen reader users from detecting the added fields. This oversight complicates form interaction and necessitates extra navigation effort. Expected Behavior: When new fields are dynamically added, screen reader users should be informed of the change. Accessible solutions include moving focus to the first newly added form field using .focus() in JavaScript, providing an ARIA live region to announce 'Room added,' and including a clear keyboard path to reach the new fields, or clearly indicating the new content's location through screen reader announcements or logical focus placement.

**k.** **Missing keyboard support for date buttons**

i.  **Issue:** The date buttons lack keyboard navigation support, significantly hindering the ability of screen reader users, who rely on the keyboard, to select a date. Consequently, users are unable to interact with the date picker, preventing them from booking a hotel stay for their desired date.

ii.  **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii.  **Impact:** The absence of keyboard navigation for date buttons poses a substantial barrier for users with visual disabilities, particularly those who are blind and depend on screen readers. This limitation restricts their ability to interact with the date picker, thereby obstructing their ability to select dates and successfully complete tasks such as booking hotel stays.

55.    Additionally, MYERS' expert again audited Defendant's Website on July 09, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this July 09, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this July 09, 2025. Evaluation are further set forth in "Composite Exhibit 1."

56.    On or about September 15, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a.    **Decorative Image Has Descriptive Alternative Text**

i.  **Issue:** A decorative image on the page is improperly assigned descriptive alternative text. This presents an accessibility barrier as decorative images should be ignored by assistive technologies. Such unnecessary or descriptive alternative text prevents screen reader users from

distinguishing meaningful content from purely decorative visuals, introducing noise and disrupting the logical reading flow.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** Screen reader users are unable to differentiate between essential and non-essential content due to the provision of descriptive alternative text for decorative images. This results in an increase in auditory clutter, thereby disrupting the logical flow of information for individuals who are blind. Decorative images should have either an empty alt="" attribute or should be implemented using CSS background images, ensuring only meaningful images are conveyed to assistive technologies, while decorative ones remain silent.

b. **Logo Link Uses Non-Descriptive aria-label Instead of Proper Alt Text**

i. **Issue:** The "Lodge of the Four Seasons" logo link uses an aria-label "200Smaller-New-Lodge-Navigation-Logo", which overrides the meaningful alternative text on the image. This creates an accessibility barrier as screen reader users cannot discern the link's purpose. Instead of recognizing the logo as the site's home link, they encounter a non-descriptive and technical label that lacks meaningful context.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 2.4.4 - A, 4.1.2 - A - Informative

iii. **Impact:** Blind users utilizing screen readers cannot ascertain the purpose of the "Lodge of the Four Seasons" logo link because of its use of a non-descriptive aria-label. This prevents them from identifying it as a home page link, thereby missing critical navigation and branding context.

c. **Links That Open in a New Window Not Programmatically Defined**

i. **Issue:** The "GET A DEAL" and "RESERVE A ROOM" links open new browser windows but lack programmatic definitions informing users of this behavior. This creates an accessibility barrier as screen reader and keyboard-only users remain unaware of new window openings, leading to unexpected context changes that may cause disorientation and disrupt navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** Visually impaired users reliant on screen readers and keyboard-only users face unexpected navigation disruptions when links

like "GET A DEAL" and "RESERVE A ROOM" open new windows without advance notice, leading to potential confusion and navigational challenges.

**d.    Menu items inaccessible for screen reader users**

    i.  **Issue:** The menu and sub-menu items lack proper role definitions such as role="menu" and role="menuitem". The automatic expansion of the menu when focus lands on a parent item, without user interaction, impedes users' ability to intentionally control menu interactions, resulting in a confusing and inaccessible navigation experience.

    ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menubar Navigation

    iii.  **Impact:** Blind users utilizing screen readers encounter accessibility challenges due to undefined roles for menu items and automatic menu expansions. This complicates navigation and restricts user control over menu interactions.

**e.    Non-descriptive and identical links announced for screen reader users**

    i.  **Issue:** The page contains links with generic text such as "Learn more," "Click here," or "Read more," which fail to clearly delineate their destination or purpose. This makes it difficult for screen reader users or anyone navigating by links to comprehend where the link leads, especially when extracted from context, like in a screen reader's list of links.

    ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

    iii.  **Impact:** Users dependent on screen readers face difficulty in navigation when links are presented with non-descriptive text. This hinders their ability to understand link destinations and purposes, especially when accessed out of context, thus making navigation inefficient and frustrating.

**f.    Two Footer Sections Defined on the Page**

    i.  **Issue:** The page includes two distinct <footer> landmarks without clear distinction or labeling, causing confusion for users of screen readers and assistive technologies who rely on these landmarks for navigation. This lack of differentiation makes it challenging to comprehend the page structure and to determine the content associated with each footer.

    ii.  **WCAG 2.1 AA Violations:** 2.4.1 - A - Landmark Regions

     iii.  **Impact:** This results in significant navigation challenges for individuals with visual disabilities, especially those who are blind, as they cannot distinguish between the footers to access relevant content. Each footer should be uniquely labeled using aria-label or aria-labelledby, such as "Global Footer" and "Subscription Footer," to facilitate clear navigation and content understanding.

**g.**     **Improper Use of <header> Tag Within Footer Section**

    i.  **Issue:** The <header> element is misapplied within the footer section by enclosing headings. The <header> tag is meant for introductory content of a page or section, not for use inside a <footer>. This misuse creates an inconsistent and confusing document structure, hindering screen reader users from correctly interpreting the content's organization and meaning.

    ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A, 2.4.1 - A - Landmark Regions

    iii.  **Impact:** This improper structuring creates ambiguity for users with visual disabilities, particularly those who are blind, as they cannot ascertain the intended hierarchy and significance of the content. Headings within the footer should be directly wrapped with appropriate heading tags, such as <h2> or <h3>, without introducing misleading semantic landmarks.

**h.**     **Non-Section Titles Like "Stay & Play" and "Visit Spa Shiki" Misused as Headings**

    i.  **Issue:** Phrases like "Stay & Play," "Visit Spa Shiki," and "Purchase a Gift Card" are incorrectly marked as headings, even though they do not serve to introduce or label sections of content. This misapplication disrupts the logical content hierarchy, making it difficult for screen reader users to grasp the page structure.

    ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

    iii.  **Impact:** The misuse of heading tags confuses individuals with visual disabilities, especially those who are blind, who rely on headings to navigate and understand the structure of the page. Only true section titles should be designated as headings; other text should be marked using elements such as <p> or <strong> to preserve the intended meaning and structure.

**i.**     **Landmark is not defined**

i. **Issue:** The absence of a <header> landmark region on the page impedes screen reader users from comprehending and navigating the page structure effectively. Without this landmark, users of assistive technologies cannot identify the beginning of the page or locate essential global elements like branding, logos, or primary navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.1- A - Bypass Blocks

iii. **Impact:** This omission poses significant challenges for visually impaired users, particularly those who are blind, as it prevents them from efficiently locating critical site components. A <header> landmark or equivalent should be established to encompass global site content, ensuring accessible navigation.

**j.** **Non-Interactive Heading Receives Keyboard Focus**

i. **Issue:** The "Guests & Rooms" heading, which is non-interactive, improperly receives keyboard focus. This creates an accessibility issue as headings are not meant to be actionable, confusing keyboard and screen reader users who cannot discern why focus is assigned to a non-interactive element.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** This issue disrupts the navigation flow for users with visual disabilities, especially those who are blind, by suggesting interactivity where there is none, potentially misleading users to think the heading is clickable or expandable. Headings should remain static and not receive keyboard focus unless they are designed to function as interactive controls.

**k.** **Screen Reader Focus Does Not Move to Newly Added Form Fields**

i. **Issue:** Upon activation of the 'Add Room' button, dynamically inserted form fields do not receive screen reader focus, which remains on the button. This oversight constitutes an accessibility barrier as screen reader users are not immediately informed of the new interactive fields, potentially leaving them unaware or necessitating manual navigation, thus interrupting the logical workflow.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** Blind users relying on screen readers may miss critical information about newly added fields, disrupting their ability to

perform tasks efficiently. Accessibility can be enhanced by moving focus to the new fields, utilizing an ARIA live region to announce changes, or ensuring logical focus placement to guide users seamlessly.

l.    **Missing keyboard support for date buttons**

   i.   **Issue:** The lack of keyboard navigation support for date buttons poses a challenge for screen reader users who rely on keyboard input to select dates. The inability to navigate and choose a date using the keyboard renders the date picker inaccessible, preventing users from booking a hotel stay for their desired date.

   ii.  **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

   iii. **Impact:** This omission significantly affects users with visual disabilities, especially those who are blind, as it hinders their ability to interact with the date picker, thus complicating the booking process. Ensuring keyboard support would enable all users to navigate through dates and make selections, facilitating equitable access and task completion.

57.    Additionally, MYERS' expert again audited Defendant's Website on September 16, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this September 16, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this September 16, 2025. Evaluation are further set forth in "Composite Exhibit 1."

58.    More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

59.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic

components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

60.     Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

61.     To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50, 51, 54, 55, 56 and 57 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MYERS, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

62.     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

63.     Because of the inadequate development and administration of the Defendant's Website, MYERS is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

64.     Enforcement of MYERS' rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

65.    MYERS has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MYERS is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

66.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MYERS appropriate and necessary injunctive relief; including an order to:

a.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b.    Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively

communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MYERS requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow

Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy

statement with an accessible means of submitting accessibility questions and problems;

K.     An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.     Such other and further relief as the Court deems just and equitable.

Dated: October 24, 2025                Respectively submitted,

**ADA LEGAL TEAM, LLC**

/s/ Kevin W. Puckett
Kevin W. Puckett        #70706(MO)
4700 Belleview Avenue, Suite 100C
Kansas City, Missouri 64112
Phone: (816) 890-9599
Facsimile: (816) 203-8590
Email: kevin@ADALegalTeam.com

**ATTORNEY FOR PLAINTIFF**